IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

LAURIE ADKINS                                                                                              PLAINTIFF

v.                                           Case No. 2:16-CV-2088

UNIVERSITY OF THE OZARKS                                                                      DEFENDANT

**OPINION AND ORER**

This action arises out of the decision by the University of the Ozarks ("the University") to end the employment of plaintiff Laurie Adkins ("Coach Adkins") at the end of the 2014-2015 softball season. The Court held a bench trial on May 22 and 23, 2017 on Coach Adkins's claim for gender discrimination under Title VII of the Civil Rights Act of 1964. Coach Adkins alleged that the University fired her because she was a woman. During the trial, nine witnesses testified and 40 exhibits were admitted. After carefully considering the evidence at trial and the legal arguments made, and based upon observation of the witnesses and an opportunity to weigh their credibility, the Court now makes its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court concludes that the University did not discriminate against Coach Adkins based on her gender.

**I.      Procedural History**

Coach Adkins filed this lawsuit claiming that (1) her termination from the University was the result of unlawful discrimination based on her sex in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e-2, and the Arkansas Civil Rights Act ("ACRA"), Arkansas Code Annotated § 16-123-107;[1] (2) her termination from the University was the result

---

[1] Arkansas evaluates ACRA sex discrimination cases using the same analytical framework courts use to evaluate Title VII sex discrimination cases. *See Greenlee v. J.B. Hunt Transp. Servs.*, 342 S.W.3d 274, 277–79 (Ark. 2009); *see also Brodie v. City of Jonesboro*, 2012 WL 90016, *2

of unlawful discrimination based on her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et. seq.; (3) the University impermissibly retaliated against her when she raised the issue of discrimination; and (4) the University breached an employment contract with her. (Doc. 1). The Court entered summary judgment in favor of the University on all but the sex discrimination claim. (Doc. 25). In opposition to the contention that it discriminated against Coach Adkins because she is a woman, the University repeatedly asserted that its legitimate non-discriminatory reason for its decision to no longer employ Coach Adkins was a failure to recruit, retain, and graduate players. (Doc. 16, p. 6; Def.'s's Trial Br., p. 3). Following the trial, the Court took the matter under advisement. (Docs. 22, 23).

## II.  Findings of Fact

The University appointed Laurie Adkins as head women's softball coach in June 2010 for a one-year term of employment subject to annual renewal. Her employment was renewed in 2011, 2012, 2013, and 2014. Her last contract of employment (Pl.'s Ex. 7) was for the period from July 1, 2014 to June 30, 2015. Coach Adkins was supervised by Athletic Director Jimmy Clark ("AD Clark"), who was also the men's baseball coach. When initially hired, Coach Adkins's job description stated that she needed to "maintain ideal roster size through recruiting and retention (20 softball)." (Pl.'s Ex. 3). However, the ideal roster size was a moving target, as documents reveal that in 2013 Coach Adkins needed to maintain a roster of "18+ next opening. 22-25 in fall," (Def.'s Ex. 5), and in 2014 it was expected that the "roster size needs to be at 24." (Pl.'s Ex. 5).

---

(Ark. Jan. 12, 2012) (unreported) ("This court has previously applied the *McDonnell Douglas* framework in reviewing the grant of a summary-judgment motion in an employment discrimination case, . . . and [the plaintiff] fails to provide convincing argument that would cause us to reconsider our use of the framework." (citation omitted)).

A 2012 employment evaluation revealed that AD Clark was very satisfied with the work being done by Coach Adkins. (Def.'s Ex. 3, p. 7). AD Clark wrote that Coach Adkins "inherited a program that was in bad shape. She has gotten them competitive." (*Id.*). He tempered the otherwise glowing evaluation with the statement that "[t]he only weakness that I have observed is in regard to maintaining the field." (*Id.*). Initially, Coach Adkins was meeting or exceeding expectations.

During a 2013 employment evaluation, AD Clark communicated to Coach Adkins that he was "very concerned about retention." (Def.'s Ex. 5, p. 7). Under the category for recruiting, Mr. Clark checked the box for "needs improvement" but did not check the box for "does not meet expectations." (*Id.*).

During a 2014 employment evaluation, AD Clark once again rated Coach Adkins as "needs improvement" under the category of "recruiting," writing in the comment section that "retention needs to improve." (Def.'s Ex. 11, p. 2). At the end of the 2014-2015 school year, AD Clark told Coach Adkins that she would no longer be employed by the University.

AD Clark testified that at the end of the 2013-2014 school year Coach Adkins was not performing satisfactorily, as shown by her retention of players and her win-loss record, which was 3-37 for that season. Also, AD Clark cited poor communication skills as a reason that he was not satisfied with her performance, and testified that he asked Coach Adkins to "over communicate" in the future. AD Clark testified that he could have fired Coach Adkins at the end of the 2013-2014 year based on that performance, but he wanted to give her another chance to improve. AD Clark testified that Coach Adkins would have to improve in these areas, but that he thought it was possible. He characterized these events as being a situation where Coach Adkins was essentially on probation, and that failure to improve would quite possibly lead to termination. While this

testimony is supported by the retention numbers and the win-loss record, it is inconsistent with the employment evaluation contemporaneously completed by AD Clark. The evaluation that AD Clark completed at the end of the 2013-2014 school year rates Coach Adkins as "meets expectations" in six categories and "needs improvement" in four categories. (Def.'s Ex. 11). There is not a single category for which AD Clark rated Coach Adkins as "does not meet expectations." (*Id.*). While AD Clark wrote in the comment section that "retention needs to improve," he did not make mention of her record of 3-37. (*Id.*). Under the category of "public relations," AD Clark rated Coach Adkins as "meets expectations" and he wrote in the comment section that she was "good around campus." (*Id.*). AD Clark's rating and comment in the "public relations" category is at odds with his testimony that at that exact same time he was concerned with Coach Adkins's communication and the number of complaints that were being directed to the President's office and trickling down to him.

AD Clark testified that Coach Adkins was not handling problems on her team thus creating issues for the administration. While the Court does not give much weight to AD Clark's testimony in light of his poor credibility, President Richard Dunsworth also testified about these complaints. In her cross examination, Coach Adkins also acknowledged these complaints.[2] The specifics of every one of these complaints are not entirely clear, nor are those specifics entirely relevant, but there is sufficient testimony in the record for the Court to find that these complaints were lodged, and that they created problems for the University.[3] What matters is that parents and softball players

---

[2] These incidents are discussed in more detail later in this opinion where legally relevant. *Infra* Section B.1.d.

[3] Ben Dykes and Heather Roberts testified that they were unaware of team discipline issues that resulted in such complaints. However, the fact that one softball player and an unpaid part-time volunteer were unaware of these issues is not inconsistent with the testimony of the President, the Athletic Director, and Coach Adkins herself, acknowledging that these complaints were lodged.

4

were complaining to AD Clark and President Dunsworth, presenting them with problems that should typically be handled by a coach.

As evidenced by the discussions that took place at the 2013 and 2014 employment evaluations, at the time that the University ended the employment of Coach Adkins in 2015, she had been aware for two years that the University was concerned about the size of her roster and the number of players retained from year to year. (Def.'s Ex. 5, p. 7; Def.'s Ex. 11, p. 2). At trial, both parties went to extraordinary lengths to document which players were playing softball over the various years. (Pl.'s Ex. 22; Def.'s Exs. 12, 13). The retention numbers reflected in these exhibits show that there was a large amount of attrition from the women's softball roster while Coach Adkins was in charge of the program. This finding coupled with the extemporaneous employment evaluations documenting this problem demonstrate that the University was genuinely concerned about this issue at the time that they ended the employment of Coach Adkins. At the end of the 2014-2015 season, AD Clark informed Coach Adkins that the University was "going in a new direction" and would no longer be employing her services.[4]

## III. Analysis

### A. Applicable Law

Because Coach Adkins presented no direct evidence of discrimination, her claims are analyzed under the burden-shifting *McDonnell Douglas*[5] test to determine whether the evidence supports an inference of unlawful gender discrimination. Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination by presenting evidence showing that: "1)

---

[4] At trial, this was called a "termination," a "firing," and a "nonrenewal" of an annual contract. The University's own contemporaneous documentation shows that this event was recorded as "termination." (Pl.'s Ex. 8). Regardless of the terminology, Coach Adkins alleged that the University made this decision based on her gender, thus giving rise to this lawsuit.

[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

she is a member of a protected group; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) she was discharged under circumstances giving rise to an inference of discrimination." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011). In establishing a prima facie case, "the plaintiff's burden 'is not onerous.'" *McGinnis*, 496 F.3d at 873 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If a prima facie case is established, the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for its adverse employment action. *Wierman*, 638 F.3d at 993. If the defendant can do so, the prima facie case is rebutted and no inference of unlawful discrimination is created, unless the plaintiff can produce sufficient evidence to create a genuine issue of material fact as to whether the articulated reason is pretext for unlawful discrimination. *Id.* Although the burden of production shifts between the parties, the burden of persuasion remains on the plaintiff at all times. *Fatemi v. White*, 775 F.3d 1022, 1041 (8th Cir. 2015).

**1.     Prima Facie Case and Legitimate Nondiscriminatory Reason**

In ruling on the University's motion for summary judgment (Doc. 14), the Court concluded that Plaintiff made a prima facie case to survive summary judgement on the gender discrimination claim. (Doc. 25). The Court also found that the University had articulated a legitimate, nondiscriminatory reason for its adverse employment action. (*Id.*). At trial, assuming that Coach Adkins presented sufficient evidence to make a prima facie showing, and that the University sufficiently articulated a legitimate nondiscriminatory reason for its actions, the Court concludes that Coach Adkins fails to show pretext. Therefore, the dispositive issue analyzed by the Court herein is whether Coach Adkins can show that the University's proffered reason for her termination was pretext for unlawful discrimination.

### 2. Showing Pretext

Showing that a defendant's proffered reason is pretext for an unlawful purpose involves clearing a high bar under Eighth Circuit precedent. Establishing pretext requires a plaintiff to "demonstrate that a discriminatory animus lies behind the [defendant's] neutral explanations ... [E]ven if an employer fires an employee based upon a mistaken belief, the employee still must offer some evidence that [discriminatory] animus was at the root of the termination." *Arnold v. Nursing & Rehab. Ctr. at Good Shepherd, LLC*, 471 F.3d 843, 847 (8th Cir. 2006). Showing unfair treatment of an employee does not necessarily give rise to a Title VII cause of action. *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 812 (8th Cir. 2005). Even where an employer overstates an employee's shortcomings and points to deficiencies that are due to factors beyond the employee's control, there still must be other evidence supporting the conclusion that the stated reason was merely pretext for unlawful discrimination. *Stone v. McGraw Hill Fin., Inc.*, 856 F.3d 1168, 1176 (8th Cir. 2017). "[A] reason cannot be proved to be a pretext *for discrimination* unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original, quotations and citations omitted), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *see also Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006). Even showing that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is correct." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146–47 (2000) (quoting *Hicks*, 509 U.S. at 524); *see Hicks*, 509 U.S. at 519 (holding that "[i]t is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination") (emphases in the original)); *Chipman v. Cook*, 2017 WL 1160585, at *6 (E.D. Ark. Mar. 28, 2017).

A plaintiff can show that any of defendant's reasons was pretext for unlawful discrimination by "showing the proffered explanation has no basis in fact" or "directly persuad[ing] the court that a prohibited reason more likely motivated the employer." *Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015). Rude comments and exhibiting a stereotypical attitude about gender do not rise to the level of showing pretext. *Kriss v. Sprint Commc'ns Co. P'ship*, 58 F.3d 1276, 1281 (8th Cir. 1995). Showing that a proportionally small number of females make up a defendant's workforce does not show pretext without other independent evidence. *See Bogren v. Minn.*, 236 F.3d 399, 406 (8th Cir. 2000); *see also Springer v. Welspun Pipes, Inc.*, 2011 WL 1157568, at n.2 (E.D. Ark. Mar. 29, 2011). Erroneous performance evaluations, general disagreements with job expectations, and poor supervision do not amount to Title VII discrimination. *Gray v. Arkansas Dept. of Housing and Urban Dev.*, 310 F.3d 1050, 1052 (8th Cir. 2002) (citing *Rose–Maston v. NME Hosps., Inc.,* 133 F.3d 1104, 1108–09 (8th Cir. 1998)). "To succeed in showing pretext[ ] the employee 'must provide some evidence that other employees were not subject to the same level of [treatment] for similar conduct." *McGraw Hill Fin., Inc.*, 856 F.3d at 1176 (quoting *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 798 (8th Cir. 2011).

**B.     Findings of Law**

   **1.     The University's Stated Reason was not Pretext for Unlawful Discrimination**

Coach Adkins offered many pieces of evidence as support for her argument that the University's proffered reason for her termination was pretext for unlawful discrimination. The Court will review that evidence by category. The Court ultimately concludes that the evidence, even if it were sufficient to show that the University's proffered reason was pretext, does not show that the University's proffered reason was pretext for unlawful discrimination.

#### a. Performance of Maintenance and Other Field Duties

Coach Adkins testified that she was expected to perform field maintenance and carry out larger facility improvement projects such as putting up and taking down backstop fences and dugout nets. This fails to show pretext for unlawful discrimination. When Coach Adkins began coaching at the University, these tasks were a part of her job description. (Pl.'s Exs. 3, 4). Coach Adkins testified that these tasks later were delegated to the University's maintenance department instead of to her. Taken at face value, all this proves is that the University expected its coaches to do physical work on their own fields, but later changed its delegation of responsibilities. To begin to show that this amounts to pretext for unlawful discrimination Coach Adkins must provide some evidence that this expectation was applied to her unequally because of her gender.[6] The only testimony that came close to making this showing was Coach Adkins's testimony that she was made to maintain more field space than that contained on her field, and that Coach Adkins had fewer student workers at her disposal than AD Clark did.

With regard to the extent of the area that she was expected to maintain, the job description clearly states that she was to "maintain the softball field *and surrounding area*." (Pl.'s Exs. 3, 4) (emphasis added). Coach Adkins did not present any proof that AD Clark, or any other male coach, was expected to merely maintain their field with the exclusion of the surrounding area. All the evidence shows is that Coach Adkins was expected to maintain the area surrounding her field as stated in her job description. With regard to any discrepancy in the number of student workers available to her as a softball coach, the University assigned more student worker hours to AD Clark

---

[6] Coach Adkins testified that Coach Carl Ramsey (a comparator for purposes of making out a prima facie case (Doc. 25, p. 9)) was never expected to perform this type of work. However, since Coach Ramsey is a basketball coach, and since the maintenance needs of a softball field differ substantially from the maintenance needs of a basketball court, the two are not comparable for this purpose.

given his dual role as the men's baseball coach and the Athletic Director. Coach Adkins did not provide a comparison to any similarly-situated male coach who received more student workers than she did. This evidence does not give rise to an inference of unlawful discrimination, let alone one strong enough for the Court to discount the University's proffered reason for Coach Adkins's termination.

### b. Teaching Math

Coach Adkins testified that she was expected to teach a three-hour math course, while male coaches were expected to teach one-hour physical education courses. All other things being equal, the number of hours required outside of the classroom to teach a math class far exceed those required to teach a physical education class, and AD Clark's testimony to the contrary is disingenuous and yet another reason the Court doubts his credibility. There is also testimony on the record that the male coaches who taught physical education were expected to teach more than one class per year, whereas Coach Adkins was expected to teach only one math class per year. Coach Adkins testified that AD Clark pressured her into teaching math instead of teaching physical education, whereas AD Clark testified that Coach Adkins requested to teach math. The evidence in the record does not allow the Court to determine whether one math class is the equivalent of two physical education classes, but the fact that the University attempted to balance the workload depending on whether a coach taught physical education classes or classes in the core academic curriculum does not support Coach Adkins's case. Accepting that AD Clark did pressure Coach Adkins into teaching math, and assuming, arguendo, that teaching one math class is far more work than teaching two physical education classes, this still does not show pretext. Coach Adkins had

a background in teaching math,[7] and teaching math was a job expectation written into her employment contract. (Pl.'s Ex. 4). No employment contract or teaching background of any male coach at the University has been offered into evidence, except for AD Clark's testimony that he and Coach Adkins were the only coaches who would have been qualified to teach math. That testimony alone offers further explanation for why Coach Adkins would have taught math and the other male coaches would have not taught math. Even assuming that the Court were to adopt Plaintiff's arguments here, there is simply insufficient evidence to show that the University's expectations for Coach Adkins here were based on her gender, and she cannot show pretext for unlawful discrimination.

### c. Comments, Attitudes, and the Culture at the University

Coach Adkins testified about comments, attitudes, and the culture at the University. Coach Adkins testified that at a meeting with all of the coaches where the University's new weight room was being discussed, AD Clark looked down the table at Coach Adkins, the only female coach in the meeting, and commented that the new weight room would be only for men. Coach Adkins testified that she wrote an email to Joe Havis (AD Clark's supervisor at the time) about this incident and his only response was to state that AD Clark had some growing to do.[8]

Ben Dykes, an unpaid volunteer in the softball program, testified about three incidents,

---

[7] Coach Adkins clarified during her cross examination that she was certified to teach secondary mathematics. Whether Coach Adkins's certification as a high school math teacher makes her sufficiently qualified to teach mathematics at the college level in a way that satisfies the University's obligations to medical school admissions boards is immaterial for purposes of this lawsuit.

[8] This incident was discussed during Coach Adkins's direct examination, but was not discussed during other trial testimony. The email that Coach Adkins sent to Joe Harvis was not produced as evidence, although Coach Adkins testified that she did not have access to the email because the University took away her email account. It is unclear if Plaintiff's counsel attempted to obtain this email during discovery.

11

apparently for the purpose of showing disparate treatment of Coach Adkins by the University. First, when Mr. Dykes was on the softball field with Coach Adkins doing field maintenance, AD Clark walked onto the field. Mr. Dykes testified that AD Clark addressed Mr. Dykes about field maintenance developments while ignoring Coach Adkins. Second, Mr. Dykes testified that at a staff stand-down ceremony, when an unidentified person was introducing the teams, the unidentified person first introduced Mr. Dykes and then introduced Coach Adkins. Third, one day when Mr. Dykes and Coach Adkins were in Coach Adkins's office together, AD Clark stopped by for about five minutes, and while there directed the conversation at Mr. Dykes rather than Coach Adkins. Mr. Dykes testified that he found these interactions strange because he was an unpaid volunteer and he would have thought that Coach Adkins, as the head coach, would have been the point person for anything softball related. Notably missing from this testimony is any comparison to the treatment of a male coach, showing that AD Clark would frequently talk directly to a male coach unlike how he interacted with Coach Adkins. The testimony by Mr. Dykes shows that AD Clark might not have liked Coach Adkins, but it does not, however, show that AD Clark treated Coach Adkins differently based on her gender. This testimony, and similar testimony at trial, does not convince the Court that the University's stated reason for terminating Coach Adkins is pretext for unlawful discrimination.

        **d.**        **The University and AD Clark's Support of Coach Adkins's Decisions**

Coach Adkins testified about multiple incidents in which she alleges that AD Clark did not support decisions that she made as a coach. These incidents were contextualized by other trial testimony, and they fail to show pretext for unlawful discrimination. In one incident, softball players tweeted and retweeted derogatory and disrespectful statements towards the end of their senior year at the University, and as a punishment Coach Adkins took away the softball jerseys

that had been given to the players as gifts ("the jersey incident"). Coach Adkins took the jerseys away from the players right before they were to graduate from the University. The parents of those students involved the administration, and the jersey incident culminated with AD Clark directing Coach Adkins to give the jerseys back to the players.

In another incident, an intoxicated 21 year-old softball player was riding in a car with other intoxicated students when the car rolled over five times ("the rollover incident"). Since this was the player's third disciplinary infraction, Coach Adkins removed the player from the team. Coach Adkins testified that University review of her handling of the rollover incident concluded with AD Clark "essentially" putting the player back on the team.

A third incident involved an injured softball player whose parent complained to the upper administration about playing time ("the injured player incident"). On cross examination, Coach Adkins clarified that her main concern with the injured player incident was that AD Clark allowed the player's mother to bring allegations to the team without giving Coach Adkins an opportunity to address those allegations. This incident concluded with AD Clark ultimately backing the decision of Coach Adkins not to play the injured player.

Coach Adkins testified that there were other incidents in which AD Clark did not back her decision to bench players. Coach Adkins also testified that AD Clark did not support her coaching decisions in that he would second guess the number of timeouts that she took in games.

Notably missing in all of these incidents is any proof that would convince the Court that AD Clark treated male coaches any differently than he treated Coach Adkins. Coach Adkins's testimony tends to show that AD Clark did not like Coach Adkins or questioned her judgment, but does not give rise to an inference of gender discrimination. Testimony revealed that AD Clark's decision in the jersey incident was motivated by the timing of the incident and the concern that

Coach Adkins's discipline would have negative repercussions for alumni relations. The cross examination of Coach Adkins with regard to the rollover incident raised questions about a possible ulterior motivation for removing the intoxicated player the team. Ultimately, even if Coach Adkins's decisions were scrutinized more thoroughly than the decisions of other coaches, the Court does not find on this evidence that it is more likely than not that the University treated Coach Adkins differently because of her gender. These incidents do not convince the Court that the University's proffered reason for terminating Coach Akdins was pretext for unlawful discrimination.

      e.      **Failure to Promote**

At several points in briefing, and again at trial, Coach Adkins raised the theory that the University did not promote her to the Senior Women's Administrator ("SWA") position, and that this shows pretext. (Doc. 19, pp. 22-23). In its summary judgment order, the Court ruled that this theory lacked evidentiary support to show pretext. (Doc. 25, pp. 11-12). Again at trial this issue arose, and the Court ruled that testimony on this point was not admissible because there was never a showing that the SWA position was open. This argument asserted by the Plaintiff is therefore not considered in determining whether Plaintiff showed pretext.

    **2.**    **To the Extent that the University's Stated Reason was Pretext, Plaintiff Has Not Shown the University's True Reason was Unlawful Discrimination.**

At trial, Coach Adkins continually presented evidence that would allow a factfinder to find that the University's stated reason for her termination was pretext, or at least was not the sole reason. The University repeatedly asserted that its legitimate, non-discriminatory reason for its decision to no longer employ Coach Adkins was a failure to recruit, retain, and graduate players. (Doc. 16, p. 6; Def.'s's trial br., p. 3). Counsel for the University reiterated this reason in his

opening statement. As the trial progressed, however, it became apparent that while retention issues with the women's softball roster were considered, there were other reasons motivating the University's decision that had previously not been brought to the forefront. The Court asked AD Clark about the conversations that he had with his superiors at the University regarding the decision made to end Coach Adkins's employment. AD Clark cited four reasons that he discussed in making the decision: (1) winning, (2) retention, (3) graduation, and (4) the large number of complaints from parents, or what AD Clark referred to as "drama." During his direct examination, President Dunsworth also revealed that conversations about termination of Coach Adkins's employment entailed those same concerns. The record has much testimony regarding the lack of winning,[9] the lack of retention, the concerns about graduation, and the high levels of drama. So while there is sufficient evidence to show that retention was a cause contributing to the University's decision to end the employment of Coach Adkins, the Court finds it more likely than not that these other reasons also contributed to the decision. However, issues with winning games, graduation rates of players, and running a sports team in a way that increases parent complaints are all permissible reasons for terminating employment. Termination for these reasons does not necessarily tend to show discrimination based on gender, and the fact that they entered the decision making process is not prohibited by law. Therefore, to the extent that the Plaintiff showed pretext, the stated reason was pretext for other legal reasons, not for an impermissible reason.

At trial, Coach Adkins argued that the University's stated reasons for its action shifted over time, and that this is indicative of pretext. "A change in an employer's legitimate,

---

[9] During her direct examination, Coach Adkins testified that when she began coaching at the University, Rick Niece told her that he did not care if she ever won a game, but rather that the team would be competitive in the ASC. This testimony seems to undermine the assertion that the University would consider her lack of wins as a reason for ending her employment. However, Rick Niece was not a witness, and this point was not developed further by Plaintiff or Defendant.

15

nondiscriminatory reason for firing an employee is probative of pretext under Title VII or ADEA only if the discrepancy is substantial." *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948 (8th Cir. 2012). By contrast, articulating additional reasons for terminating someone while not deviating from the originally stated reason is not problematic, especially where the additional reasons have "generally been alternate ways of stating the original reasons offered." *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 613 (8th Cir. 2014). Nothing prohibits an employer from elaborating on its proffered explanation for an adverse employment action. *See Elam v. Regions Fin. Corp.*, 601 F.3d 873, 881 (8th Cir. 2010). The additional reasons provided by the University are elaboration, and they are not incompatible with the originally-stated reason. Thus, while the Court agrees with Coach Adkins that the University has shifted its explanation for her termination, the manner in which it has done so does not support a finding that its proffered reason was pretext for unlawful discrimination.

### 3. Same Actor Inference

The University urged the Court to adopt the same actor inference and conclude that there was no discrimination because the same individual both hired and fired Coach Adkins. The University argued that this creates a "strong inference … that his motive was not unlawfully to discriminate." (Def.'s Trial Br., p. 1) (citing *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173 (8th Cir. 1992)). In the age discrimination context, the Eighth Circuit Court of Appeals has said "it is unlikely a supervisor would hire an older employee and then discriminate on the basis of age, and such evidence creates a presumption against discrimination." *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 877 (8th Cir. 2008). "An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class." *Waterhouse v. D.C.*, 298 F.3d 989, 996 (D.C. Cir. 2002) (quoting *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461,

464 (6th Cir. 1995), and further citing cases in agreement from the Fourth, Fifth, Seventh, Ninth, and Eleventh Circuit Courts of Appeal). The best reading of this case law is that whether the same actor hired and fired an individual is one factor in the totality of circumstances for the factfinder to consider in deciding whether unlawful discrimination occurred.

AD Clark testified that he hired Coach Adkins, but he also repeatedly used the word "we" in describing her hire, and it appears that a committee was involved in the hiring decision. If AD Clark was the ultimate decision maker with respect to hiring Coach Adkins, it is unlikely that he would hire a woman and then fire her because she was a woman. But still, assuming Coach Adkins could show that the University's reasons for her termination were pretextual, there is insufficient evidence that the actual reason AD Clark decided to terminate her was unlawful discrimination. Consequently, she did not persuade the Court that unlawful discrimination was a more likely reason for her termination.

### 4. An Inference Created by First Offering the Coaching Position Previously Held by Coach Adkins to a Woman

In both pretrial briefing and during the trial testimony, both parties were concerned with litigating the issue of whether the University first offered the vacancy created by Coach Adkins's absence to a woman before hiring a man to replace her.[10] The University argued that because AD Clark attempted to replace Coach Adkins with another woman, this creates a "strong inference" that AD Clark's motive in terminating Adkins was not because she was a woman. (Def.'s Trial Br., p. 2) (citing *Thomas v. Runyon*, 108 F.3d 957 (8th Cir. 1997). The cited case does not hold that any such inference is created, however, and treats the replacement of a plaintiff by someone

---

[10] At one point during trial, counsel for Coach Adkins suggested through questioning that she had a witness who would call into doubt whether the position was first offered to a woman. This witness ultimately was not called, and the testimony showed that the University did indeed offer the position to a woman.

17

in the same protected category as an additional circumstance to be weighed in the totality of circumstances, weighing it as a factor that is probative of a legitimate, nondiscriminatory reason. *Thomas v. Runyon*, 108 F.3d 957, 961 (8th Cir. 1997). The Court declines to adopt the University's proposed inference, but finds that this factor provides additional support for the conclusion that Coach Adkins cannot show the proffered reason was pretext for unlawful discrimination.

### III. Conclusion

Coach Adkins has not shown that any of the University's reasons is pretext for unlawful discrimination. For the reasons set forth above, the Court concludes that the University did not discriminate against Coach Adkins based on her gender.

IT IS THEREFORE ORDERED that this case is DISMISSED WITH PREJUDICE. Judgment will be entered accordingly.

IT IS SO ORDERED this 30th day of June, 2017.

*/s/ P. K. Holmes, III*
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE